We will now move to the second case of the morning, United States v. Arthur Friedman. This is case number 19-2004. And we're going to begin arguments this morning with Mr. Greenberg. Good morning, your honors. This is a highly unusual case, and when I say highly unusual, I think that the fact pattern that I'm going to talk about, not relating necessarily to the alleged criminal conduct, but the circumstances of the case, is one that I've never seen, and I doubt if you've seen a similar fact pattern. So it's a unique case. In this particular case, two men went to seek the advice and counsel of an attorney, retained the attorney, paid the attorney, and were jointly represented by the attorney, Jeff Steinbeck. Jeff did not caution them, warn them, tell them that there could be any problems as a result of this dual representation, work with them, met with them, emailed with them, spoke on the phone to them. And after a matter of months, one of them, Arthur Friedman, decided that he wanted to get a different attorney, and he went out and engaged Michael Ettinger. At that point, Jeff even sent a check to Ettinger, refunding some of the retainer that Friedman had paid him. Friedman was represented by Ettinger until I came into the case, maybe a year before trial. Shortly before trial, the government files a Santiago proffer, and we learn that Leon Billis, the co-defendant, and more importantly for these purposes, the other person who Steinbeck jointly represented is going to be the star witness, in fact, really the only fact witness in this case against Friedman, and we move to bar him as a witness or dismiss the case. The court sets an impermissibly high bar for us. The court at that point says, we're going to have a hearing. I don't think Judge St. Eve really thought that anything was wrong, but she granted us a hearing. But at that hearing, she expected Arthur Friedman to do exactly what he did not have to do. She wanted him to tell her what he had told Steinbeck, without any protection similar, we asked, and she said no, without any protection similar to a Fourth Amendment claim where that could not be introduced against him. And so Friedman was placed in the position of trying to protect his right, trying to keep from being prejudiced by this conflict, and given an impermissibly high evidentiary bar to meet that he shouldn't have, because the law says that when an attorney represents someone and then represents someone with an adverse interest, the conflict is presumed. There was clearly a conflict there. Now, what did that do to the case? Well, initially, Leon Billis, when the case is investigated, tells the Buffalo Grove police that he committed this fraud. Arthur was removed from it, and that was true. Arthur was not involved in the day-to-day activities of the business. But Steinbeck knew that Arthur had a minor role or no role, and Steinbeck knew the value of flipping Billis on Friedman. Billis, who to this day, by the way, hasn't been sentenced. And Steinbeck knew what Friedman had told him he did. And regardless of what the court ruled in saying that Steinbeck said he wasn't influenced by it, and Steinbeck said that Friedman didn't really tell him anything, the fact is that it's presumed that Friedman told him things, and it's presumed that he was influenced by it, and those decisions that he wasn't are wrong. Now, why is this even more messed up? Leon Billis goes to trial, and in his mind now, Arthur Friedman is the main guy. He's the leader. We talked about everything. He knew everything. He filled out documents. He did this. He did that. Although there's no witness who ever saw him sign anything. There's no witness who says that he ever filled out a document, except for Leon Billis, the same person who was represented by Steinbeck. What also happens? There's a bank fraud. There's a bank victim. Shortly before trial, around the time that Billis pleads, the victim bank loans to he and his wife $700,000, and that's not disclosed. We find out about this after the trial. We file a Rule 33 motion, and the court, by this point it's Judge Kendall, says that we should have discovered this under due diligence, and it was merely impeaching and so forth. But it wasn't. This was the victim bank of a multimillion dollar fraud, giving money to one of the alleged fraudsters, someone that they had a million dollar judgment against, and putting in their bank documents. One of the reasons they did this was because he was helping them to get Arthur Friedman. It's worse than that, though, because at trial, we asked about any arrangements between the bank and Leon, and Leon said, there really are none, and the bank people said, there really are none. So we not only have the information we didn't discover and wasn't disclosed to us, but we have them lying about it at trial. And they said, the judge said, that we should have discovered this with due diligence. Again, I can't imagine a scenario where anyone would possibly think that the victim bank of a multimillion dollar fraud would turn around and loan money to the fraudster while a federal indictment is pending. I don't think the most diligent of attorneys would have subpoenaed the bank and said, did you loan any more money to the people who defrauded you while they're under federal indictment for defrauding you? How else does this play out at trial? At trial, the government's theory, based on Leon, becomes Arthur Friedman is the president of this business, and as the president, he knows everything about the business. And they capitalize on an improperly drafted Pattern 7th Circuit instruction. Now, the government has said that we have waived this issue. I know that this court in the Freed case looked at this issue and talked about what's waiver and said that if we're looking at a pattern instruction, they're presumed to accurately state the law. We looked at the pattern instruction. It was the pattern instruction. We assume, frankly, that it adequately or accurately stated the law, and we were wrong. That should not bar relief here, because what the government did was they then made the argument. They said he was the president. He knew what was going on. He was the president. He knew about the loans. He knew, he knew, he knew, he knew. And the jury was relieved of finding, as required, that he willfully engaged in certain conduct. In Freed, it was argued that Freed was the, because he was the president, he knew everything that was going on. But in Freed, Freed was actively involved. He was submitting stuff to banks. He was signing stuff. All of that was proven. Here, none of that existed. None of that existed. How to did the government, if someone's asking a question, I'm sorry, I'm getting. No. Okay. How is the government also, did they capitalize on this reduced burden that they had? Closing arguments. The government argues, go with your gut. And we object. And the court says, gut, they're just arguing common sense. And then the government repeatedly says, go with your gut. They say that because there's more witnesses, go with your gut. They say because there's a lot of documents, go with your gut. Going with your gut is the complete opposite of common sense. Going with your gut is a visceral reaction to things. Going with your gut is what we tell police officers that they should not do when they're making a probable cause determination. Going with your gut is exactly what they shouldn't do when they're supposed to look at the evidence, analyze the evidence, determine whether the evidence meets reasonable doubt, apply their common sense and their everyday experience to it. Not their gut feeling. That's entirely what a jury's not supposed to do. And the court, although the court said, well, she's referring to common sense, that common sense instruction doesn't say go with your gut. And in fact, the common meaning of it isn't to go with your gut. And the government in their brief, they rightly recognize that that's not proper argument to say common sense is the same as gut. So we've got all of these fundamental problems with this case, which was at best closely balanced because the jury acquitted Friedman of two of the five counts that were out there. How did they how did they capitalize on it? Also, there was a transaction for a person named Blackman, one of the counts. And the government went through this theory. He had to know he was the president of business. He had to know everything. He knew everything because he was the president of the business. Well, in the Blackman case, the loan documents didn't even get admitted into evidence. The only piece of evidence of that loan was a letter that was buried in the back of the cart that went back to the jury. There was no other evidence, but they said he knew go with your gut. He knew it was completely improper argument. The last issues that we've got are related to sentencing and some enhancements that Mr. Friedman received. He received an enhancement, a sentencing enhancement for obstruction of justice for his testimony at the hearing with Steinbeck where he shouldn't have had to testify. And it's very interesting because there were only two people who testified about that meeting, Steinbeck and Friedman. And Steinbeck described the meeting in great and vivid detail, even describing where the chairs were placed in the room and who was sitting in which chair. And the meeting took place in his office, the Meninac building on the 14th floor. And he remembers it clearly. He remembers everything he was told and all that. Friedman said, we met in Rockford at the Clocktower Inn in the coffee shop. Steinbeck gets in his car after he finishes testifying while Friedman is on the stand and calls the prosecutor and says, he leaves a message that's part of the record and says, you know what? As I was thinking about the questions I got in cross-examination by Friedman's counsel, I realized the meeting didn't take place in the Meninac. The meeting took place in Rockford at the restaurant, like the questions were suggesting. So how can you believe anything Steinbeck said if this meeting, which he so vividly described, the place and the setting and where people were sitting and so forth, never even took place? And how could you use that testimony vis-a-vis Friedman's testimony about how they met, which did take place, to then enhance him for obstruction? How can you enhance him for obstruction for a hearing that never should have taken place? The last thing on sentencing is that he also was given a substantial enhancement for monies taken by the floor planners that they lodged out on. And the reason he was given that enhancement was because the judge found, the sentencing judge, which again was Judge Kendall, found that he should have disclosed to the floor planners that he was engaged in a fraud, which I don't know what that was based on. No case law was cited for that proposition at all. And she was apparently of the belief that every dime of revenue and every dime that was put into the business to run the business somehow must have been part of the fraud. In fact, how car dealerships work is you have the floor planners, you borrow money from the floor planners to buy the cars. That's what they did in this case. And then they sold the cars. Some of the floor planning money didn't get repaid when the business failed. Up to that point, the people were getting paid. It had absolutely nothing to do with the fraud because this particular fraud was after the cars were sold, after the floor planners were paid back their money, then the allegation was that fake transactions were entered into and fake loans were obtained from the bank. And unless there's any questions, I'll reserve the rest of my time. Thank you, Mr. Greenberg. You do have ten minutes remaining. Thank you. We're now going to move to Ms. Chung on behalf of the government. Thank you. Good morning, and may it please the court. This is Ashley Chung representing the United States. Starting with the purported conflict on the part of Mr. Steinbeck, who was Leon Billis's attorney during this trial, the district court here made factual findings that no conflict of interest existed, and it did not clearly err in making those findings, nor did it abuse its discretion in denying the defendants many motions on that basis. In defense in Mr. Friedman's counsel's review of the fact, he noted that Mr. Steinbeck had jointly represented Leon Billis, the defendant, and Prestige, the business, years before the federal prosecution. And contrary to defense counsel's contention, as the district court found during the evidentiary hearing below, Mr. Steinbeck had advised both Leon Billis as well as the defendant that at some time they may later need independent counsel. And in fact, after only approximately three months, Mr. Friedman did retain independent and unconflicted counsel of his choice. That occurred over three and a half years before federal charges were brought in this case. Then after the defendant first raised this issue on a motion to dismiss the indictment less than a month before the trial, the district court considered extensive briefing from both sides and also held the evidentiary hearing on this issue. And importantly, this hearing also included ex parte proceedings in order to protect any privilege and any privileged information that may arise. Nonetheless, after hearing testimony from both Mr. Steinbeck as well as the defendant, and including testimony that came in ex parte, the district court found as a factual matter that there was no evidence of any conflict, that the defendant had not shared any individual confidences with Mr. Steinbeck, and that no privileged information had been used to the defendant's prejudice. Now, contrary to defense counsel's contention, the law is clear that in claiming that his trial was tainted by an attorney conflict of interest, the defendant bore the burden of establishing an actual conflict and prejudice. And the district court here found multiple times that the defendant had failed to do either. This court's holding in white is instructive. There, the defendants had claimed that the potential use of information from their former attorney violated their constitutional rights. The district court in white had also held an evidentiary hearing, offering an opportunity for the defendant to show a violation and found that they had failed to do so. This court explained in white that the issue on appeal was not whether Sixth Amendment rights had been violated, but whether the defendant's former attorney had violated his ethical obligations. This court then ruled that the defendants had failed to meet their burden of establishing privilege and an actual ethical violation or conflict. And although the defendant here continues to claim that the circumstances in his case are extraordinary, in fact, these same facts have arisen before in McNeill. McNeill in the Sixth Circuit involved an attorney who had previously represented the defendant in related state proceedings and then represented the primary government witness in the defendant's federal trial. And like the defendant here, McNeill alleged that his former counsel had violated ethical rules of professional conduct. We'll note that the circumstances in McNeill were more serious as a prior state proceeding was presumably more extensive than a three-month joint representation from several years prior to federal charges, which is what we have here. Nonetheless, the Sixth Circuit in McNeill also ruled that there was no violation of the defendant's fair trial rights where the defendant had again failed to show an actual conflict of interest and resulting prejudice or impairment of his interest. The Sixth Circuit explained if the conflict is merely hypothetical, there is no violation. Here, where the district court conducted a full evidentiary hearing and found as a factual matter that there was no breach of privilege, no conflict, and no prejudice, this court should affirm. With respect to the bank agreements that the defendant contends constitute newly discovered evidence warranting a new trial, these agreements could have been discovered before or during the trial with due diligence. The defendant knew prior to the trial, as was conceded in the defendant's opening brief, that Mr. Billis, his co-schemer and the co-owner of Prestige, had settled with American Eagle to repay the bank. Nonetheless, the defendant made no effort to obtain records of the financial arrangements between Billis and American Eagle Bank before trial. Moreover, during the trial, both bank witnesses and Mr. Billis testified regarding his agreement to repay the bank. And Mr. Billis also testified about making additional payments to American Eagle Bank on a home equity loan. So again, contrary to defense counsel's contention, at no point did the bank witnesses or Mr. Billis falsely testify about the existence of these arrangements. The defendant could have further questioned Mr. Billis and the bank witnesses about these agreements and their terms on cross-examination. He failed to do so. Additionally, as the jury had already heard about these financial agreements at trial, any further information regarding these agreements would have been immaterial, cumulative, and impeaching. Again, the jury heard from these witnesses about the arrangements. And with respect to Mr. Billis, he had already been thoroughly impeached at trial in relation to his cooperation agreement with the government. Indeed, the jury was instructed by the court to consider Mr. Billis' and other witnesses' testimony with caution and great care, taking into account witnesses' possible bias, prejudice, and any other reason to lie. The jury nonetheless credited Mr. Billis' and the bank witnesses' testimony as is evidenced by their verdict. Moreover, use of these agreements at trial would not likely have resulted in the defendant's acquittal. Even if the jury had heard more about these agreements and their terms, the evidence here of the defendant's guilt was strong, and it included, in addition to Mr. Billis' testimony about the fraud scheme, and in addition to the bank witnesses' testimony about their discovery of the fraud and the defendant's admissions regarding his involvement, extensive documentary evidence of the fraudulent loans, the testimony of other victims and purported borrowers, including the defendant's own cousin, Daniel Krasilovsky. It included checks from the defendant's own bank account paying off fraudulent loans, testimony of prestige employees regarding the defendant's responsibility for the finances of the company, and testimony of floor plan investors and customers about other fraudulent transactions at prestige. The district court's conclusion here that the bank agreement would not have affected the results of the trial is adequately supported by the record, and its ruling was not an abuse of discretion. Now, with respect to the aiding and abetting instructions that were given at trial, as a starting matter, the defendant has waived any challenge to the instructions. The defendant consented three times to the instruction before it was given. First, at the pretrial conference. Second, during trial, when the defendant challenged a different instruction, but not the one challenged here on appeal. And third, just before the defense rested, when after the court had specifically asked the party to go through each instruction and ensure that they confirmed that they were appropriate, the defendant again confirmed that he had no changes to the instructions. This court explained in Lebeau that although passive silence with regard to a jury instruction permits appellate review, a defendant's affirmative approval of the proposed instruction results in a waiver. Here, the defendant's repeated approval of the instruction as given, before and after challenging other instructions, constitutes intentional abandonment of this challenge. Even if this court were to find that the defendant merely forfeited his challenge, he cannot show plain error. As defense counsel acknowledged, the challenge instruction mirrored a pattern instruction, which is presumed accurate. And the pattern instruction, 5.06, does in fact accurately state the law. With respect to the first paragraph, 5.06a, accurately states the law on aiding and abetting. Namely, that a person aids and abets a crime when he participates in the crime as something he wishes to bring about and seeks by his actions to make it succeed. The instruction as given adequately addresses the requirement of an affirmative act in furtherance of the crime, as the defendant apparently concedes in his reply, and also accurately instructs with respect to the required mens rea. Someone who knowingly participates in a criminal scheme and tries to make it succeed intends the scheme's commission, which accurately states the state of mind requirement for aiding and abetting bank fraud. With respect to 5.06b, this instruction accurately states a general principle of vicarious or scheme liability. Namely, that a person is responsible for acts that he knowingly causes another person to carry out. Now, the defendant assumes that 5.06b is intended to mirror or be coextensive with Section 2b of Title 18 of the United States Code, but the two are in fact distinct. Section 2 defines who is punishable as a principle for a crime, and it defines it to include aiders and abettors, and under 2b, someone who willfully causes someone else to do what, if done personally, would be an offense against the United States. So Section 2b applies where the act being caused is itself a crime, most obviously where, for example, it would be illegal for the defendant to commit the act, but would not be where an intermediary who lacked the requisite mental state or prohibited status did so. Unlike Section 2, and unlike 5.06a, 5.06b does not explain who may be found guilty of an offense. It does not purport to be, nor should it be read as a Section 2b instruction. It simply supplements 5.06a, explaining that one who knowingly acts through another is responsible for those acts, which are not in and of themselves offenses. Regardless, any instructional error here did not seriously affect the fairness or integrity of the defendant's trial, as Section 2b liability was not relevant to this prosecution. The government's case proved that the defendant devised, participated in, and personally executed the fraud scheme. The reference to the aiding and abetting instruction was made only once in over 55 pages of closing arguments here. And after closing, the district court thoroughly instructed the jury regarding each element of the crime, including the required mens rea, and the government's burden of proof beyond a reasonable doubt as to each element. Any error here did not affect the outcome of the trial. With respect to the government's statements on rebuttal, the references to the jury using its gut, in reviewing those references in context, it is clear that the government meant common sense. The government affirmatively explained as much to the jury twice, saying, look at the evidence in your gut, your common sense, use your common sense, check your gut. Then when the defendant first objected during rebuttal, the government explained in the jury's presence to the court that the government meant common sense. When the defendant objected a second time, the court then said in the jury's presence that it would instruct the jury that they are to use their common sense, and that is what the government is arguing. That is entirely permissible. Judge Brennan, on this use of the word gut, a review of the transcript seems to yield that after the objection was overruled, that the prosecutor went back to using that term, and perhaps the concern may be that the overuse of the term gut resulted in its definition broadening, that it was more than just common sense. What is your response to that? My response to that is first that although the term gut continued to be used after these objections and clarifications, that these clarifications and instructions nonetheless applied, and the jury is presumed to have followed these instructions. However, even assuming, for argument's sake, that the definition of gut could have been interpreted as having become broader or having expanded, and even assuming some impropriety here, these statements did not deprive the defendant of a fair trial. Even after the references were made in rebuttal argument, jury instructions provided by the court more than adequately addressed this matter. The jury was instructed that they must make their decision based only on the evidence seen and heard in court, that the lawyer's statements are not evidence, that they should use their common sense and draw reasonable inferences from the evidence, that the defendant is presumed innocent, and that they are to be impartial judges of the facts, whose sole interest is to determine whether the government has proven its case beyond a reasonable doubt. And there were multiple other instructions, again, reiterating and referencing the government's burden here. These were repeatedly reaffirmed after the government's rebuttal. And in addition to the references to guts being explained by the surrounding marks of the government and the court, and the district court repeatedly and accurately informing the jury of its burden of proof, here, the weight of the evidence against the defendant was strong. It included, to briefly summarize, it included testimony from not only Leon Billis, who, contrary to defense counsel's characterization, was not the only fact witness at the trial, but also testimony from the purported borrowers and whose names the fraudulent loans were taken out, from witnesses from the victim bank, from customers and floor plan investor witnesses, who were also defrauded in the defendant's scheme, extensive documentary evidence showing records of the fraudulent loans, the payments made on those loans, the export records of the cards, et cetera. And contrary to defense counsel's contention, the fact that the defendant was acquitted on two other counts only shows that here, the jury was not overcome by their instinct. They did not improperly rely on their intuition in deciding that the evidence was sufficient to support a guilty verdict and to find the defendant guilty beyond a reasonable doubt. Here, the district court, in considering the defendant's arguments with respect to the statements in rebuttal, reasonably determined that there was no misconduct and its rulings should be affirmed. With respect to the sufficiency of the evidence, that's to count seven, the trial record includes more than sufficient evidence from which a rational juror could find that the defendant knowingly executed the scheme with respect to the specific loan taken out in the name of Mr. Blackman. Again, Mr. Billis, the co-defendant and co-owner of Prestige, testified at trial that the defendant had not only devised the fraud scheme, but also that the defendant and Billis spoke about every fraudulent loan and made their decisions together. With respect to this loan in particular, there was evidence that the payments on the loan were made by Prestige, not by Mr. Blackman, the purported borrower, and this was consistent with the fraud scheme as testified to by Mr. Billis and as evidenced by additional payment records shown for other fraudulent loans. In addition, the evidence showed that prior to the Blackman loan application to the bank, Prestige had also accepted money from a floor plan investor for the same car, accepted payment from another customer for the very same vehicle, and had then exported the vehicle and never delivered it to Mr. Blackman nor to anyone else, and that in total, Prestige received approximately $300,000 for this vehicle and that several of the payments came in after the car was exported. All of the above is in addition to the other extensive evidence about the defendant's fraud scheme more generally and his involvement with respect to other fraudulent loans and his admissions about the fraud when it was exposed. Based on all of this evidence, a rational juror was entitled to infer the defendant's guilt after count seven, as the jury did in this case. With respect to the sentencing enhancement for obstruction of justice, again, this was based on the evidentiary hearing held below on the question of the attorney conflict of interest, and under Guideline 3C1.1 and Application Note 4 to that guideline, it applies where the defendant commits perjury, that is where the court determines that the defendant lied in court about crucial matters. The district court here did just that. It found that the defendant had been evasive, his demeanor was not forthcoming, and that the testimony he gave was implausible to the point of breaking the court's credulity. The sentencing court then found after review of the orders on defendant's motion to dismiss and post-trial motion on review of the transcript of the evidentiary hearing and its review of the audio recording of that hearing, that there was no question that the defendant had falsely testified to benefit his defense. These are factual findings of special deference which are supported by the record and do not constitute clear error. With respect to the loss amount and restitution calculations and the inclusion of the losses to the floor plan investors, here the district court correctly found by a preponderance of the evidence that those losses were part of the scheme to defraud and not legitimate transactions as the defendant contends. The fraud on the floor plan investors was part of the charged scheme in the indictment which charged that it was used to keep the business afloat and conceal the fraud and undertaken without disclosing the ongoing bank fraud to the investors, and the trial testimony and evidence further supported that. In addition to the factual basis in Leon Billis' plea, which again corroborated and stated and established all of that information, there was trial testimony that the defendant was responsible for relationships with the floor plan investors, testimony from the investors about how they later learned that the cars they had purportedly financed were missing and that they were never repaid, and that a number of cars that were the subject of floor plan investments were also sold to other customers, the subject of fraudulent bank loans, and exported. In light of all of this evidence, the district court did not clearly err in finding that more likely than not, the losses to the floor plan investors were all part of the scheme to defraud, that they were all part of the musical chair circulation of funds that was keeping the business afloat. And for the same reason, the district court did not abuse its discretion in including this in its restitution calculation, as these were actual losses caused by the offense conduct and required to be paid to the floor plan investors as victims who were harmed in the course of the defendant's fraud scheme. Unless the court has additional questions with respect to the sophisticated means enhancement or with respect to any of the other issues that have been argued here today, the government would now rest. Thank you, Ms. Chung. Mr. Greenberg, we're going to move back to you, and as I mentioned before, you've got ten minutes. Okay, thank you very much. I will try and go in the same order since that seems to be logical and working. First of all, the McNeil case that the government keeps talking about is an unpublished Sixth Circuit case on an ineffective assistance claim under 2255. It has no bearing here. The White case, the court in that case found that the information that had been disclosed to the attorney was intended to be shared with third parties. So, again, we're not dealing with necessarily privileged information. Here we have a situation where the law quite clearly says that the information is privileged. The information is sacrosanct. The information is not supposed to be shared with anyone else, and more importantly, the attorney who represents a defendant is not supposed to flip someone else on that defendant. This is not something where, I don't know where this came from in the argument, where the trial court advised the two defendants about separate counsel, and then Mr. Freeman turned around and three months later got a different attorney. Mr. Freeman got a different attorney before they were ever charged in federal court. In fact, before they ever had any federal court proceedings, any wind of any federal court proceedings. One of the things that Mr. Herman and I discussed when we were talking about this is why should the government? We asked that the testimony be barred. Well, that's a harsh remedy for the government, but there are other situations where the government has to suffer sometimes of something not of their own doing. Typically, in a motion to suppress, the government itself is not the party that's committed the wrongful act. And when you look at the law, you look at things are written to help a defendant to ensure that a defendant has a fair trial, a fair proceeding, start to finish. That's why the defendant has the right to confront witnesses. That's why the defendant has the Fifth Amendment right. That's why the defendant gets to decide whether or not he should plead guilty. It's a unique case. But this is so outrageous, so outrageous what has occurred here, that this court should fashion a unique remedy. Billis' testimony should have been barred at a minimum, or the case should have been dismissed. Regarding the bank and Mr. Billis, I again disagree with the characterization of what the transactions were. We were given documents. I was the trial attorney. We were given documents about the bank's lawsuit with Billis and what had gone on when they sued him. We were not given any documents showing that he had made another or received another loan. And when they testified, the people from the bank and Billis, that he was making regular restitution payments, and the government says, well, I should have discovered that was false testimony, he wasn't making regular restitution payments. He owed the bank almost $2 million in total by that point, and he paid $300 one month, and four months later he paid a few hundred dollars. Even this new loan that they gave him to help them get Friedman, as they wrote in their documents, he wasn't making the payments he was supposed to on that. The government says that the evidence in this case is strong, so none of this matters. That's not true either. The jury acquitted Mr. Friedman of two of the five counts. Yes, there was documentary evidence, and you know what we knew from that documentary evidence? We knew that Friedman's name wasn't on any of it. Friedman hadn't signed anything. Even with the floor planners, they say that he had this extensive dealing with the floor planners. In fact, the testimony was that they primarily dealt with Billis every once in a while. They'd say hi and bye to Friedman. The evidence was they dealt with Billis. The floor planning agreements were signed by Billis, even though Friedman was the president of the business. The extensions of the agreements were signed by Billis. The loan documents that were admitted into evidence in this case, except for a couple of them, were all Billis' relatives. The return address on them, Billis' home, all of it pointed back to Billis. Kraslowski was Friedman's cousin. Sure, he testified, and he was severely impeached, testifying under a grant of immunity, so he's the great care and caution witness. The gut argument. I know there was a question about that. Did it go beyond common sense? In fact, they differentiated in the argument from common sense. The prosecutor, in her rebuttal, as she concluded, after saying gut several times and my objections getting overruled, she concludes by telling the jurors, do these two things. The first is look at the evidence, look at it closely because we're not afraid of it. Look at the actual stuff because that will prove the defendant's guilty. You'll see exactly what we're talking about. But the second thing is trust your gut, okay? Trust it. Go back there, and if your gut is telling you the president of a two-man company, we're not talking about GM, the president of a two-man company knew exactly what was going on, and the company's failing, but he's still taking money out, go with it. If your gut is telling you that there were just too many people who came in there and told you, he knew, go with it. If your gut is telling you, if your gut, if your gut, if your gut, she distinguishes it from common sense. And while we like to presume that the jurors are reading instructions and following the instructions, where the jurors are being told that common sense and gut are two different things, and they go back there in the jury room, and my objections have been overruled saying that they're two different things, you can't expect the jurors to think that they are anything but two different things. So to say that an instruction would cure this kind of an argument of telling the jurors to go with their hunch, to go with their feeling in the pit of their stomach, to go with whatever they think, after they've looked at the evidence, put that aside, and then search your gut for what's what. That's what they were telling the jurors to do. As far as the instruction, your honors, the instruction in Freed, in Freed, the court specifically said that the instruction was supposed to be based on the statute, on 18 U.S.C. 2B. It wasn't a common law expansion or anything like that that they were talking about. It wasn't this vast liability. It wasn't just if you knew something was wrong. It was you have to willfully take steps. You have to intend to do things, and it's very specific what it requires. I'm sorry, was someone asking something, or is that me hearing things again? No, you're okay. Okay, thank you. And beyond that, again, the law doesn't say that the floor planners should be part of the law simply because that's how the business was being funded. That's not what the law requires. So unless there's any questions, I think that covers it. Thank you, Mr. Freeman. I'm sorry. I'm sorry. Can I add one thing? Go ahead. Mr. Herman, that's the advantage of doing this by phone. Mr. Herman can point me to things that I miss. He pointed out with respect to the instruction, the argument given by the prosecutor in his closing argument was that he said that he thought that the judge was going to say that if you knowingly aid, counsel, command, induce, or procure the commission of an offense, you can be found guilty of the offense. If you participate and try and make it succeed, and if you knowingly cause the acts of another, there was never any discussion of willfully. They went on to explain it, that if he was the president of the company, if he knew what was going on, almost implying that he had an obligation to stop it, and if he didn't do that, that he was guilty, that he had an obligation to step in. And that's not enough. That's not what the statute requires. Thank you. Thank you, Mr. Greenberg, and thank you, Ms. Chung. The case will be taken under advisement.